IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**HILARDO N. JUAREZ,**

    **Plaintiff,**

**vs.**                                                                                                    **Civ. No. 00-447 JP/RLP**

**ELKHORN OPERATING CO., INC.,**

    **Defendant.**

## MEMORANDUM OPINION AND ORDER

On March 19, 2001 Defendant filed a "Motion to Enforce Settlement Agreement" (Doc. No. 39). That motion will be denied.

**I.     Background**[1]

Plaintiff is a New Mexico citizen. Defendant is an Oklahoma corporation. On March 28, 2000 Plaintiff filed a complaint alleging violations of Title VII and 42 U.S.C. § 1981, arising out of his employment with Defendant at its plant in Artesia, New Mexico. Sometime around May 18, 2000 the parties of their own initiative hired a mediator in Dallas, Texas. Each party executed an "Agreement to Mediate" provided by the mediator, which cites to certain sections of the Texas Civil Practice and Remedies Code.

The lawyers chose a Dallas mediator as a mutual convenience: Plaintiff's counsel works in Houston, Texas, and counsel for Elkhorn is based in Tulsa, Oklahoma. On May 2, 2000 counsel for both parties met with the mediator in Dallas. At then end of the day, Plaintiff's counsel made an offer of $70,000 ($7,500 of which was to be apportioned to attorney's fees). Defendant did

---

[1] The factual allegations, to which Plaintiff does not respond, are taken primarily from Defendant's Memorandum.

not accept the offer.

By May 8, 2000, the lawyers apparently had returned to their respective cities but were then communicating by phone through the mediator in Dallas.  On that day, Defendant's counsel offered to settle the case for $60,000.  Later on May 8, 2000 Plaintiff's counsel rejected that figure but indicated that Plaintiff would settle for $70,000 if Defendant responded within a day. Apparently within a day, Defendant agreed, through its lawyer and the mediator, to settle the case for $70,000, including attorney's fees.  This acceptance of Plaintiff's offer formed, in Defendant's view, an enforceable contract.  On May 8 and 9, 2000 Plaintiff apparently was in New Mexico. There is no indication as to the whereabouts on May 8 and 9, 2000 of the representative or representatives of Defendant who authorized Defendant's counsel to settle the case for $70,000.

With a cover-letter dated May 11, 2000 Defendant's counsel sent to Plaintiff's counsel two documents:  (1) "Settlement Agreement, Waiver and Release" ("May 11 agreement") and (2) "Receipt of Settlement Agreement, Waiver and Release" ("May 11 receipt") (collectively "May 11 documents").  The May 11 receipt contains blanks for Plaintiff to sign and date.  It also states that "I know that I have 21 days to review and consider the Settlement Agreement, Waiver and Release."  The May 11 agreement reflects the figures discussed through the Dallas mediator on May 8 or 9, 2000.  The May 11 agreement also purports to (1) give Plaintiff seven days after execution to revoke acceptance in writing, (2) "be governed by" Oklahoma law, and (3) authorize Defendant to withhold taxes from the settlement sum.  Plaintiff never signed the May 11 receipt or the May 11 agreement.

On May 16, 2000 the lawyers, for the first time, discussed taxes.  In a letter that day, Plaintiff's counsel proposed that Defendant not withhold any sum for taxes.  Plaintiff's counsel

apparently deemed some or all of the settlement proceeds, whether paid under Title VII or section 1981, to remedy a physical injury, making the amount for that purpose non-taxable income under section 104(a)(2) of the Internal Revenue Code.  Plaintiff's counsel offered to provide his own proposed tax language and Plaintiff offered personally to indemnify Defendant from any resulting claim by a taxing authority for failure to withhold.  On May 17, 2000 Defendant rejected these proposals.

Defendant preferred that Plaintiff's counsel provide a written opinion that the money for Plaintiff was non-taxable and that Plaintiff's counsel also provide his own personal indemnification.  In the alternative, Defendant suggested re-drafting the tax section of the May 11 agreement to indicate that the parties were not sure whether the proceeds for Plaintiff were taxable but that Defendant would withhold taxes nonetheless.  If Plaintiff's tax advisors then concluded that the payment should not have been taxed, Plaintiff could seek a refund.

In a letter dated May 17, 2000 Plaintiff's counsel indicated that the parties "clearly do not have a meeting of the minds on settlement" but that he would convey Defendant's proposal to his client.

In a letter dated May 24, 2000 Plaintiff's counsel proposed amending the May 11 agreement to state that Plaintiff would be "fully and solely" responsible for any withholding liability.  Plaintiff's counsel also repeated an assertion made earlier that his views on taxation were supported by the law firm of Baker & Botts.  Plaintiff's counsel apparently never indicated the basis for his or Baker & Botts' views.

In a letter dated June 5, 2000 Defendant's counsel indicated that after researching Plaintiff's proposed language, he concluded that the payment to Plaintiff would be subject to

3

"some sort" of withholding. Nevertheless, Defendant's counsel indicated that he would use Plaintiff's language if a "Big 5" accounting firm or "substantial" law firm, of Plaintiff's choice and Defendant's approval, rendered an opinion supporting Plaintiff's views. If the opinion stated that federal income taxes and FICA need not be withheld, Defendant would pay for the opinion and withhold nothing. If the opinion said that Defendant should withhold something, Defendant would do so and Plaintiff would pay for the opinion. In a response letter dated the same day, Plaintiff's counsel rejected this proposal.

By June 23, 2000, the parties had again enlisted the aid of the mediator in Dallas. In a letter dated that day, the mediator indicated that the parties were not far apart: Plaintiff asked that Defendant issue his share ($62,500) with a 1099. Defendant was willing to issue a 1099 for $22,500 of Plaintiff's share and apportion the remaining $40,000 to wages, subject to withholding. In a letter also dated June 23, 2000, Plaintiff rejected Defendant's proposal.

On June 26, 2000 Defendant filed its answer and a counterclaim for breach of settlement agreement. In a Memorandum Opinion and Order filed on October 5, 2000, I dismissed the counterclaim. On November 21, 2000 the parties met with Magistrate Judge Puglisi in an attempt to settle the case. Again, the question of taxation proved insurmountable.

**II.     Discussion**

Defendant moves to enforce the settlement agreement it claims the parties reached at the conclusion of the May 8, 2000 mediation in Dallas. Defendant argues that New Mexico choice of law rules point to applying either New Mexico or Oklahoma substantive contract law, and that when either of these bodies of contract law is applied, the court must conclude that the parties formed a settlement contract which Plaintiff must honor. Plaintiff's position is that Texas contract

law applies because the parties have already chosen it. Plaintiff contends that under Texas law, or even New Mexico contract law, the parties reached no agreement, i.e., that they did not form a contract. Additionally, Plaintiff argues that even if there had been an agreement it would not be enforceable.[2]

### A. The parties did not reach an enforceable settlement agreement under Texas contract law.

A federal court must apply the choice of law rules of the state in which it sits. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). Under New Mexico law, a choice of law determination is unnecessary where the parties choose in advance what law will govern their relations. Reagan v. McGee Drilling Corp., 123 N.M. 68, 72, 933 P.2d 867, 871 (Ct. App. 197). Plaintiff claims that the parties did just that before they began mediation, choosing Texas law in

---

[2] Counsel for each of the parties also accuse each other of acting in bad faith: Plaintiff's counsel for taking the position that his client is physically injured and Defendant's counsel for violating confidentiality rules imposed during the Dallas mediation and by Judge Puglisi. I need not answer the question of whether a settlement payment to Plaintiff is non-taxable under 26 U.S.C. § 104(a)(2) "on account of personal physical injuries or physical sickness." I will answer the question as to whether confidentiality rules have been broken, and the answer is no. The discussions in settlement conferences conducted by the Magistrate Judges of the District of New Mexico, and in most other alternative dispute resolution fora, are confidential. But there is a narrow exception: details must and will be revealed where, as here, they are necessary to resolve a dispute of the parties' own making arising from the failed mediation. There is nothing vexatious in Defendant's counsel's disclosure of the particulars of the settlement negotiations in this case that would warrant sanctions under 28 U.S.C. § 1927. In fact, it appears that this case has deteriorated because Plaintiff's counsel has failed to support his assertions concerning the tax code, or failed to make himself or his client aware of possible tax consequences before mediation, rather than during or after, or some combination thereof. Therefore, I will not sanction Defendant's counsel. However, Plaintiff's alternative request to submit this case for a new settlement conference will be granted. I will reserve decision on Defendant's motion for summary judgment (Doc. No. 43) until the conclusion of the settlement conference. Both parties should be mindful of Judge Puglisi's practice requiring that the parties make a good faith effort to negotiate on their own before the settlement conference and that the parties outline their efforts for Judge Puglisi. (Doc. No. 22.) Plaintiff's request that Defendant bear Plaintiff's expenses related to the settlement conference will be denied.

the "Agreement to Mediate" that each side allegedly executed on or about April 18, 2000. Defendant asserts that "Plaintiff fails to establish any evidence that the parties actually specified Texas law." (Reply at 1-2.)

While the parties do not appear to have selected Texas law to govern every state law aspect of their case, they did select Texas law to the extent it resolves the pending motion. Plaintiff has supplied for the court his signed "Agreement to Mediate," the terms of which Defendant does not contest. Plaintiff also has presented uncontested and unrebutted evidence, which the court will therefore accept as true, that a representative of Defendant signed an identical "Agreement to Mediate," which the mediator refused to release to Plaintiff's counsel. (Pl's Ex. 3.) Plaintiff's "Agreement to Mediate" reads, "[M]ediation will be conducted in accordance with **Section 154.001 et seq., Texas Civil Practice and Remedies Code** . . . ." (Pl's Ex. 2) (emphasis in original). The Texas Civil Practice and Remedies Code, at section 154.071(a), states that "If the parties reach a settlement and execute a written agreement disposing of the dispute, the agreement is enforceable in the same manner as any other written contract." In agreeing to mediate in accordance with section 154.001 "**et seq.**"[3] of the Texas Civil Practice and Remedies Code, the parties agreed to comply with section 154.071(a). The real question is the legal effect of section 154.071(a) of the Texas Civil Practice and Remedies Code.

Defendant's position is that section 154.071(a) reinforces the notion that settlement agreements reached through mediation are entitled to enforcement as any written contract would be. Defendant is likely correct. See Martin v. Black, 909 S.W.2d 192, 195 (Tex. Ct. App. -

---

[3] "And those (pages or sections) that follow." Black's Law Dictionary 574 (7th ed. 1999).

6

Houston (14th Dist.) 1995).  Nonetheless, the statute quite plainly indicates that before a settlement agreement is enforceable as a Texas contract, it must be (1) reached or agreed upon by the parties and (2) reduced to an executed writing.  The negative implication in section 154.071(a) and cases like Martin is that settlement agreements which do not comply with the two-part procedure in section 154.071(a) are not entitled enforcement.  Because any oral agreement reached at the conclusion of the Dallas mediation has yet to be memorialized with a signed writing, it is not enforceable under Texas law.

      **B.**    **The parties did not reach an enforceable settlement agreement under New Mexico conflicts law, which would apply Texas contract law.**

If the parties did not choose to apply Texas contract law, New Mexico conflicts law operates to apply Texas law anyway, again resolving Defendant's motion in Plaintiff's favor.  Defendant argues for the application of New Mexico's lex loci contractus "place of consummation" choice of law rule, and directs attention to Pound v. Insurance Co. of N. Am., 439 F.2d 1059, 1062 (10th Cir. 1971), State Farm Mut. Ins. Co. v. Conyers, 109 N.M. 243, 246-48, 748 P.2d 986, 989-91 (1989), and Sandoval v. Valdez, 91 N.M. 705, 580 P.2d 131 (Ct. App. 1978).  Defendant claims that the "place of consummation" rule operates to apply the substantive law on contract interpretation or enforcement from New Mexico (from where Plaintiff authorized settlement for $70,000) or Oklahoma (from where Defendant's counsel accepted the offer on his client's behalf).  The laws of both states, in Defendant's view, would uphold the alleged oral contract.

      Sandoval does not clearly support Defendant's stated proposition, although it does indicate that New Mexico follows the conflict of law rules in the first Restatement of Conflict of

7

Laws. Sandoval, 91 N.M. at 707, 58 P.2d at 133; see also Ratzlaff v. Seven Bar Flying Service, Inc., 98 N.M. 159, 162, 646 P.2d 586, 589 (Ct. App. 1982). Pound, 439 F.2d at 1062, and Conyers, 109 N.M. at 248, 748 P.2d at 991, indicate that I should look to law of the place of consummation, that is, where the last act forming the contract occurred. But because all three decisions were based on where a written contract was executed, they are of very little aid as to how to apply the "last act" analysis to this case's alleged oral telephone contract involving clients, lawyers, and a mediator spread across three different states.

Fortunately, the apparent progenitor of the "last act" application in New Mexico, Alexander Film Co. v. Pierce, 46 N.M. 110, 121 P.2d 940 (1942), cited in Pound, 439 F.2d at 1062 n. 4, provides a bit of guidance. In determining where the contract in Pierce was made, the New Mexico Supreme Court relied upon rules compiled in C.J.S. Pierce, 46 N.M. at 112, 121 P.2d at 941. C.J.S. indicates that a contract made by telephone is made at the place from which the accepting party speaks. 17A C.J.S. Contracts § 372 (1999). But that rule also applies to agents. Id. An undisclosed representative of Defendant in an undisclosed location at sometime on or before May 8 or 9, 2000, communicated acceptance to Defendant's agent--its lawyer--in Oklahoma. Defendant's lawyer then communicated the acceptance to his agent--the mediator--in Dallas. The mediator then communicated acceptance from Dallas to Plaintiff's lawyer in Houston, resulting, for the first time, in a meeting of the minds.[4] Thus, the last act necessary to

---

[4] The mediator was of course acting generally as an agent for both sides, that is, as a dual agent. Restatement (Second) of Agency § 392 (1958). But in accepting for Defendant and his lawyer, by means of a telephone call from Dallas to Houston, the mediator was at the time acting primarily as Defendant's agent.

8

complete the alleged contract occurred in Texas.[5]

Plaintiff's view is that Defendant puts the cart before the horse. The "last act" inquiry presupposes the existence of a contract, according to Plaintiff. Indeed, in the trio of cases upon which Defendant relies, the primary choice of law question was where the contracts were signed, not whether they existed. Pound, 439 F.2d at 1062; Conyers, 109 N.M. at 248, 748 P.2d at 991; and Sandoval, 91 N.M. at 707, 580 P.2d at 133. In Plaintiff's view, the existence of a contract is still at issue. Plaintiff's position is that the parties have thus far only exchanged offers and counteroffers. (At the same time, he seems to concede that the parties may have orally agreed upon a dollar figure.) Plaintiff argues that they never agreed upon the taxation question, thus no contract can govern any of the alleged oral settlement.

When the existence of a contract is in dispute and a choice of law question is raised, the first Restatement of Conflict of Laws requires the forum court to first ascertain "the 'place of contracting'" to determine which law to apply to analyze a contract's existence. Restatement (First) of Conflict of Laws § 311 (cmts. a-d) (1934). The authors of the first Restatement in comment c explain that the term "place of contracting" is merely a "shorthand expression" and that its use should not be construed "to assume that there is a contract [but rather] to determine the state to the law of which reference is made to ascertain whether there is one." In comment d, the authors further indicate that the "place of contracting" is "the place of the principal event, if any, which, under the general law of Contracts, would result in a contract."

---

[5] If the assumptions about the locations of the various individuals at different relevant times are in fact incorrect, Defendant will have failed to meet his burden under New Mexico's contract law which he asks me to apply. Camino Real Mobile Home Parke v. Wolfe, 119 N.M. 436, 444, 891 P.2d 1190, 1198 (1995) (indicating that the burden of proving the existence of a contract under New Mexico law on the one seeking its enforcement).

In this case, that place is Texas. The alleged contract which Defendant seeks to enforce is an oral agreement made as a direct consequence of a very important event: the parties' lawyers' mediation, in person, in Dallas, Texas, on May 2, 2000.[6] On May 8, 2000 Plaintiff extended an offer, through his lawyer and then through the Dallas mediator. Defendant accepted within a day, also through its lawyer and then through the Dallas mediator. Although the parties and one of the lawyers were presumably out of Texas by May 8 and 9, 2000, the mediator in Dallas was still the hub for the negotiations. The agreement which Defendant moves to enforce would be established, if at all, through her. She received, in Dallas, Defendant's acceptance and conveyed it from Dallas to Plaintiff's counsel in Houston. The minds would at last have met--another very important event--in Texas. Under these circumstances, Texas is the place of contracting, as that term is used in New Mexico conflicts analysis.

In sum, whether the proper inquiry is a "last act" analysis which assumes the existence of a contract, or whether it is one focusing on the "principal event," New Mexico choice of law rules require that I apply Texas contract law. I have previously found that Texas contract law would not support an oral settlement agreement unless it is confirmed by a signed, written settlement agreement. Thus, Defendant's motion should be denied applying New Mexico choice of law rules.

### C.  Even if the parties' conduct following the Dallas mediation resulted in an oral contract, enforcing it would have no net effect.

Given the two writings (the May 11 documents) which Defendant drafted following the Dallas mediation, Defendant argues for a rather absurd result. The May 11 receipt and the May

---

[6] The alleged oral agreement thus "initiated from" the Dallas conduct. <u>Stevenson v. Louis Dreyfus Corp.</u>, 112 N.M. 97, 99, 811 P.2d 1308, 1310 (1991).

11 agreement each contains provisions that would permit Plaintiff to walk away from any oral commitment he made in Dallas. Defendant would have me, in effect, force Plaintiff to pick up where the parties left off after Defendant presented the May 11 documents to Plaintiff. Plaintiff would certainly then either invoke his right "to review and consider" the May 11 agreement for twenty-one days, and presumably reject it, or execute the May 11 agreement then exercise his right to revoke it within seven days, or both.

Defendant offers a few reasons why this would not be so. First, Defendant contends that "the draft revocation language" was not a bargained-for essential term of the settlement agreement and that the language might not have been preserved in the final form. But, essential or not, Defendant and not Plaintiff crafted "the draft revocation language," then sent it to Plaintiff for signature. Nothing suggests that Defendant intended to further edit the May 11 documents or that Plaintiff was expected to discern which provisions Defendant deemed non-essential. Second, Defendant points out that Plaintiff's refusal to proceed did not arise out of the May 11 documents and that Plaintiff even now has not invoked the revocation language. These assertions may or may not be accurate. Nevertheless, they do not explain why it would not be silly to, in effect, force Plaintiff to sign one or both of the May 11 documents then rely on their language to revoke his acceptance.

IT IS THEREFORE ORDERED THAT Defendant's "Motion to Enforce Settlement Agreement" (Doc. No. 39) is denied.

_____
CHIEF UNITED STATES DISTRICT JUDGE